Our next case is General Electric v. United Technologies, 2019-13-19, I guess we're not quite clear yet. Mr. Lee, we're ready when you are. Thank you, Your Honor. May it please the court, my name is Bill Lee and together with my partner, Warren Fletcher, we represent General Electric. Let me turn immediately to the standing issue directly. Can I just interrupt you? What additional evidence that's more concrete in this case, in this declaration, do you have than the last time around where at least the majority of the panel found it insufficient? That is precisely where I was going to go, Your Honor. There are five facts that are in this record that were not in the record in the prior case, all of which derived from the fact that, unlike the last case, GE is currently developing an engine that UTC is likely to accuse of infringement. And here are the five facts. The first, all geared turbofan engines have a core nasal, a fan nasal, a low-pressure spool containing a turbine and a compressor, a high-pressure spool containing a turbine and Secondly, commercially competitive engines for the relevant market for the past several years have had certain parameters which were outlined in the supplemental De Tomaso Declaration, paragraph 4. Third, there is an engine currently in development at General Electric. It is described in the confidential portions of paragraph 24 and paragraph 5. That is the most fundamental distinction from the prior appeal where there was no, there was no engine in design that could potentially implicate the patent. The prior appeal, your declaration, I think essentially said this is a competitive field we're likely to design. We may want to design but we didn't have specific plans and now you're saying we have specific plans to design an engine that is likely to be accused of precisely to that. What the record here demonstrates is that GE plans to design a competitive engine for the marketplace and its current design, the one described in paragraphs 24 and paragraph 24 of the De Tomaso Declaration and paragraph 5 of the Supplemental Declaration are the preferred design. So the prior decision said what was missing was evidence that GE is an engine now. The prior appeal, the facts referred to an engine that had been designed but was not being pursued. It is now being signed and being pursued. And then the other portion of the prior decision was definite plans to use the claim features that are described in the declarations and there are definite plans to bring a competitive engine to market, a competitive engine that will likely have those features. We would suggest, Your Honor, that that fills the gap that's identified in the prior decision. And perhaps best evidence is UTC doesn't really quarrel with those facts. It doesn't offer you any other facts different than those facts but actually says that's still too speculative. Well that actually takes you so far as to suggest that GE would have to say or JTAC isn't saying that. GE shouldn't be required to do that. GE isn't saying that it's infringing. What it's saying is, to use the words of JTAC, there's a substantial risk that if it pursues its present design, its present course, and brings that engine to market, UTC will assert this patent against it. And that is sufficient to satisfy the standing requirement. Because, Your Honor, the rest of the case, the rest of the facts, demonstrate that injury in fact is required. It's a very small market with only three people designing engines. It's a market with a very, very long design cycle. Mr. Lee, you're not asking this panel to ask the court to go in bank. We're not asking... That's the cleanest way rather than trying to squirm around prior case. Your Honor, I think that I would say two things. As from the prior case, it's clear that GE's position would be that even the facts of the prior case would demonstrate the type of competitor standing that the Supreme Court says is sufficient. But we understand we're bound by the panel decisions. So what we've done is look carefully at the panel decision. And the panel decision said, no present design, no present plans. And so we've done, we hope, is provide a declaration to answer Judge Hughes' question that says, yes, we are. Your argument still had an ambiance about speculation, an absence of injury in fact. I mean, you have a design. Why can't you design around? We don't know what's going to happen at the end of that production process. You may or may not have a problem. Your Honor, there is truth. There is that ambiguity. But that's why the case is recognized that you don't have to, you only have to have a substantial risk. You don't have to concede infringement. You don't have to admit infringement. You don't have to identify each and every limitation. This, Your Honor, is, is there a sufficient injury in fact? And the injury in fact here is we're in a three-player market with very long design cycles where people are investing, as you know from the declarations, millions and millions of dollars on an annual basis. It takes a decade before those investments come to fruition. But you're making design decisions judged against the background of a patent with a very broad claim. How is that different from the development of a pharmaceutical? Your Honor, I think it, I'm trying to think through the example. I can, I can think of examples where you would be designing a pharmaceutical, where there would be a patent that is, had very general broad claims and that you thought was anticipated or obvious and you would pursue an IPR. And that ought to be, if you're designing a product, if it's on the books, you're pursuing it, and you're trying to clear the playing field for that product, and you lose at the PTAB, you should have a right to appeal. So I think that there's, it doesn't matter what the technology is. And it shouldn't matter what, at the end of the day, what the result's going to be. Because particularly in this case, where the design cycle is so long. You say it doesn't matter what the technology is. I, I always thought one of your strongest argument is that in this type of, with this product, we're dealing with a different type of market, with different type of competition. We're dealing with a different investment scheme and research and development type of structures. But you, you don't seem to rely too much on that type of argument. Your Honor, if I didn't, I was unclear. You're right. I mean, we think that for the question of injury in fact, the facts that you just articulated are precisely the reason there's an injury in fact. And precisely the reason that you want to clear the playing field when you have this small number of competitors in a market with a long design cycle where the investments are significant. You're not arguing that this is a DuPont case? No, we are not. We are arguing, I think at the risk of simplification, we are saying two things, which is if the standard were the Supreme Court's competitor standing standard, we would have it. But if it's not, if it's the panel decision in the prior GE case, and you look specifically at what was said to be missing, we have tried to provide as best we can, given everything that Judge Rania has the vagaries of a long design cycle of a product like this, everything we could. And I think the question that the briefing by the other side would cause me to ask is this, if this is not enough, what is? And to remember that... Look, you can look at a spectrum. On the one hand, you have DuPont, where they were building a plant that was there. On the other hand, you have non-commercial parties. And here you're in the middle. And isn't, aren't we in the area of fact questions then? Well, there are certainly fact questions. I think it goes to Judge Hughes's question, because there is, we can see the difference between the record in the prior appeal and this appeal. And the difference is what is currently occurring now. And given what is currently occurring now, if we could not take this appeal, what would be required to do it short of conceding infringement? And the answer would be virtually nothing, given everything that Judge Rania has... Well, if we're talking about that spectrum, if there's some, if there's not anything short of you're currently infringing to give you standing, then nothing would give you standing, except we're currently infringing. But that's, to me, sounds like you wouldn't even need to go to the PTAB. You could just go file a declaratory judgment action if you're infringing and go there if you wanted to. If you... Do you see any light of day between the declaratory judgment standard and Article 3 standing on appeal from an administrative agency when Congress has already provided a cause of action? Yes, I think it should be easier in the latter than the former. And the declaratory judgment standard would require certain things beyond what the competitor standing or the ABX case or the prior decision in the case requires. I mean, this is a context that, as I said, has all of what Judge Rania decided, but also, this is in the record. In an effort to try to clear the playing field, GE has filed 31 IPRs. There have been 100 claims disclaimed during this process, 100 claims that could relate to the engine that GE wants to design that will come to market 10 years from now and then be used for 25 more years. So we're talking like a 35-year-old window. This should be enough, and it should be enough particularly if I move to the merits before I go into my rebuttal time. And on the merits of the question of obviousness, let me say this. The findings of the PTAB in A16 and A23 to A24, together with KSR, are and should be dispositive. And again, there are five. First, the PTAB says, and there's no dispute, that Wendis discloses each limitation of Claim 10 except for two stages. Third, for these types of engines, prior to the filing date of the 2020 patent, it was either one or two stages. Fourth, it was a binary decision. And fifth, one of Ordnance, Skill, and the Art knew that if you use one stage, it costs less and weighs less. If you use two stages, it was more reliable and more efficient. But if you change the number of stages, you're changing the system. You've got to make a lot of changes, right? Your Honor, that's what they claim, but there's no proof of it. And there's no proof that one of Ordnance, Skill, and the Art couldn't have done that and had a reasonable expectation of success. And the two best facts to indicate that is, if you look at the specification of the patent, the person of Ordnance, Skill, and the Art here actually is a rocket scientist. That's what the person is by agreement. The specification has virtually nothing that tells you how to design this claimed engine, and it's because the person of Ordnance, Skill, and the Art wouldn't know how to do that. And then if you take the breadth of the claim, right, and you look at the combination of Wendis and Moxon, there is nothing to suggest that that couldn't be combined without a reasonable expectation of success. And I think the last thing I'll say to save my rebuttal time, Your Honor, is this. The answer to your question might have been no reasonable expectation of success. The PTAB says explicitly, we're not relying upon no reasonable expectation of success. We're not reaching that issue. We will save the remainder of your time. Mr. Lee, Mr. Coyne. Thank you, Your Honor. May it please the Court. I'm Patrick Coyne, representing United Technologies Corporation. The standing issue, as Judge Hughes pointed out, is slightly different than it was before. They rely on two things, the new market aircraft, which is now aborted. The program's been canceled by Boeing. They didn't bid a geared engine. So those facts are relevant. The only facts that are different are the De Tomasi declaration and Mr. Long's declaration. My colleagues identified a number of factors in there that he feels get them over the hurdle. They don't. Why? Because what this Court's jurisprudence clearly establishes, whether it's economic injury or competitive injury, is that they have to be doing something that uses the claimed invention. So they have to be currently infringing? No, Your Honor. We are not contending they have to be currently infringing. Well, if they're using the current claims, they're infringing. Well, if they're using them. But what AVX permits them to do under the competitive standing doctrine is to have plans. If they were planning something that had concrete plans that would use the claimed invention, we wouldn't be able to sue them for that. They haven't committed an act of infringement yet. They simply have plans. It's a thought crime. We can't go after that. They haven't made, used or sold. So if they're designing an engine that potentially infringes, can you sue them? No. If they're designing an engine that potentially infringes, they haven't committed an act of infringement yet. Well, Claim 9, from which Claim 10 depends, is a method of designing a claim. Why wouldn't that infringe if they are using your method to design this engine, even if they haven't actually put it into production? In that specific situation, if they're using that method of designing, that would be an act of infringement. That doesn't mean that we're saying in every instance you have to infringe in order to have standing. You don't. This particular claim is a method of designing that engine. What they have to be designing, though, the whole here is twofold. Number one, they aren't saying they're designing the engine. They haven't said clearly, we are designing this. We have concrete plans. Well, we're not going to go on the record and say we're going to infringe this patent. And there's no precedent that says they have to admit to infringement before they have Article 3 standing. No, Your Honor. So if that's the fault you're finding, then I think your argument doesn't have any merit. I'm not saying that that is not the fault that I'm finding. The fault that I'm finding is what is it that they are designing? What they have said is only two elements. This claim has nine structural elements, 16 to 18 limitations, depending on which claim you look at. They've identified only two that they say that they are considering. Secondly, the fault is that it's still not a statement that we are designing. It's a statement that we're considering. We're going to continue to consider. We might possibly do it. We are very far from a design here at this point. And the design that we are looking at includes not all the limitations. It includes only two. Now, Mr. Lee has said, oh, well, you're going to obviously fall within the scope of the claim. That's just not true. In fact, what the board found at page 828 of the appendix in the board's final written... Why do they have to say they're going to obviously fall into the scope of the claim? Why can't they say we are expending money, we have designs, and it is very likely that we're going to fear infringement here? But there's a substantial risk of infringement. Why isn't that what standing is? Because the substantial risk of infringement they're arguing is their subjective belief that we are going to sue them. They have not identified anything yet for which we could sue them, for which we are likely to sue them. There's got to be an element of reasonableness to this, some objective reality. They're basing it on, oh, I'm using two of nine elements. I'm not going to tell you whether I am using the claimed invention or whether I fall within something that's covered by it. Stop talking about telling them that you're using the claimed invention. Even you said that that's not required for standing. They don't have to admit that they're infringing. Your Honor, you're correct. They do not have to admit that they're infringing, but they have to be undertaking plans to do something that would use the claimed invention. That raises a substantial likelihood of infringement. At least, yes. And what they haven't, that is not what we have in this court. So they don't have to go through each and every claim element and say our engine is going to have this, our engine is going to have this, our engine is going to have this, do they? Do they have to go through each and every claim element? I don't know necessarily. If they're going to do that, then they're going to be saying, yes, we're infringing each and every single claim element. I can see, Your Honor, that there may be situations where what they're doing is close enough that they'd be worried about getting sued under equivalence. We're not even close to that line in this case because all they've identified is that they want to use two of the nine structural elements. And they haven't identified any of the limitations of the claim that they fall within. So, again, getting back to what this court has said in AVX, it's their burden to show that they are, in fact, have concrete plans and to do something. They don't have to have done it. They don't have to have committed an infringement yet. But they have to have concrete plans to do something that would likely infringe. Wouldn't the amount of investment that they've incurred show those concrete plans? No, Your Honor. Well, not on this record. Would they be able to put in? Sure, they could put in and say, look, I spent this much to avoid this patent. But they didn't do that. What they've said is, I've invested, I think it's under the confidential record, a lot of millions of dollars over the past 40 years. Well, this patent hasn't been around for 40 years. There's no nexus. What they've put in as proof of how much they've spent has no nexus to this invention. They're including things they did 40 years ago on programs that they've abandoned 20 years ago. So that doesn't get them over the hurdle. They still have to be doing something under the sports holdings in JTAC, AVX, GE, that they are doing something or planning to do something, have concrete plans to do something that would be covered by the invention. And then secondly, as I said, the statements they've made possibly considering it's too speculative. So is it your view that there's hardly any factual differences between this case and GE-1? I'm sorry, Ron? Any factual differences between this case and GE-1? Sure. In GE-1, all they put in was evidence of the NMA program, which wasn't sufficient, and that program's now been canceled by Boeing, so it's moot. They've put in evidence on this program for this, what they call the next generation aircraft program. But as I've said, what it fails to do is show that they have plans to use the claimed invention. So getting back to Judge Hughes's point, no, if they start the design process and they're designing it, sure, they're infringing then, but they haven't shown plans for even a program that would use the claimed invention. What do you mean plans? Are you talking about actual design or specifications, user specifications? Well, the Tomasi Declaration lays out this design process. You go through a cycle of requests for information with the airframer. Then you have requests for proposal. Then they down-select how many engines they're going to— Are you saying all that's missing here? They haven't told us where they are in the process at all. They outlined this process. So in order to give Article III standing, which is not a particularly high hurdle, they have to give you detailed plans of their corporate strategy in designing airplane engines? No, Your Honor. They don't have to go that far. All they have to do under this Court's jurisprudence is have a concrete plan, not having actually undertaken the design yet, but a concrete plan to design something that would likely infringe. They haven't done that. They said, worth possibly considering thinking about it, and it will have only two of the nine elements. That's way far of the line they need to reach. It's too speculative at this point. They will have, as they pointed out themselves, years of further development for this engine. Come back when they have a plan to do something that implicates this plan. So then they have to undertake a specific plan and start incurring significant financial costs before they have Article III standing in order to clear what they think is an invalid patent? No, Your Honor, I wouldn't go that far. If you said that, it's not correct. I wouldn't go that far. I would say that they have to have a concrete plan to do that type of design. They don't have to start at the— Thank you for—I'm sorry. I'm talking for you, too, but I appreciate when you stop. Too many of your colleagues in the bar do not. What does it mean to have a concrete plan, then, if they haven't undertaken it? Isn't it—this is an area that is competitive. There's only three engines here. There are a certain number of choices here, and we intend to design next-generation engines, or whatever you want to call them, that are likely to infringe because these are the kind of elements our clients are going to want. Is that not a concrete plan? No, that's not what they've said. What they've said is, we intend to make a competitive engine. We're afraid they're going to sue us. Don't quibble on the facts here. Just assume what I said is an accurate depiction of their declaration. Is that a concrete plan? I don't think it is, Your Honor. And what's not concrete about it? Because they haven't said specifically they are moving forward with that plan. They haven't reached the design stage yet, but they haven't said they're moving forward with that plan. They simply said, we're considering it, and we're going to continue to consider it. Of course, getting patent clearance is sometimes a preliminary to proceeding with a plan and making a big investment. Sure, but they're not going to be making that big investment. So right now, the program— a sentence that says, we intend to move forward with engine design that has a substantial likelihood of infringement. If they had a sentence that said, we intend to invest money and develop client business in an engine design that has a substantial likelihood of infringement. If they came forward with competent evidence and further said we've got a concrete— that it was sufficient to show a concrete plan, a fixed plan to move forward, right now that's not what we've got. That sentence just said that. We have a concrete plan to pursue engine design and develop client business of an engine design that is likely— has a substantial likelihood of infringing that patent. Well, I guess, Your Honor, I don't agree with the characterization of the De Tomasi declaration in that regard. I'm asking you a hypothetical. Okay. Maybe I didn't make that clear. I'm sorry. Is that sentence, if it was in the declaration, sufficient? If they had said, we have a concrete plan and brought competent evidence of it— What do you mean by competent evidence? Admissible evidence. They'd have to be bringing the declaration. Again, we did not, Mr. Lee pointed out— The declaration has that sentence in it. The declaration does not have the sentence that says— No, no, no. I'm not asking about the facts again. I'm sorry. I'm asking a hypothetical. A declaration has that sentence. I don't want to repeat it again. Okay. Is that enough? I'm not sure it would be, Your Honor, because this court— What is lacking there? Well, what's lacking there is that this court has said repeatedly, you have to be doing something that's covered by the patent. So it has to be a concrete plan to do something that would be covered by the patent. And what's lacking is they've only identified— I thought that's not enough. I thought that's the standing. No, Your Honor. It's not enough because the substantial likelihood it's clear from the declarations they filed. So you think the thing has to say, we have a concrete plan to move forward the engine design that will infringe? Well, or that's close— Again, we're not close to the line in this case, but they'd have to come— Please stick with the hypothetical. Yes. I mean, I don't care about the facts here. What's the difference between substantial likelihood of infringement and what I think you were just about to say is, you know, maybe not actual infringement, but close enough? Okay. The difference here is that they— I mean, you agree that the standard is substantial likelihood of infringement, isn't it? Yes, Your Honor. Objectively, reasonably, not because they're saying that they think we're going to sue them when we don't have any factual basis to do that. Well, that's what I'm a little curious about. What kind of factual basis do you need beyond their statements under oath in declarations that they're going to do this? Do they have to lay out their actual business plans and their actual design plans for their competitor? Not all of them. They'd have to lay out enough to show that it implicates this claim, that what they're planning on building and designing and spending money on would be covered by this claim. Your Honor, if I could switch. I only have a minute and a half left. If I could switch to the merits. Mr. Lee briefly touched on that. He's identified five factors that he said the Board found in their favor. I'm not going to quibble with that. The Board did find certain facts in their favor. But what he's missing is that the Board didn't rule in their favor. If this issue was, is there substantial evidence to support a hypothetical finding in their favor? Sure. But there's substantial evidence to support the findings the Board did make in our favor. The Board looked at the evidence as a whole. It applied the correct legal standard. And weighing the evidence, the Wendis and Moxon are fundamentally inconsistent. One says, go to the one stage, and the other says, don't even think about it. So the Board is absolutely on solid ground in terms of substantial evidence for all of its findings, applied the correct standard, and reached the correct result. There's no issue here of error in the Board's consideration. I only have 50 seconds left, Your Honor. If anybody has any questions, I'm happy to try to answer them. Thank you, Mr. Coyne, unless you want to use your 45 seconds for a summary. Okay. Well, Your Honor, getting back to the, this Court's precedent is very clear. The claim does present some challenges because it is a method of designing, yes. And that probably narrows their scope of that, on that spectrum of how much space they have. But we're not saying they have to infringe. But they do have to have a concrete plan to do something covered by the patent. And these declarations do not provide it. Thank you, Your Honor. Thank you, Mr. Coyne. Mr. Lee has some rebuttal time. Yes, Your Honor. I'll be brief. On the standing issue, thank you, Mr. Coyne. Can you try to explain to me what your friend on the other side is saying in the light of day, between actually infringing and a concrete plan to, I don't even know what the standard is, to infringe? Your Honor, the honest answer to your question is I can't, because I don't think there's any daylight between what they're urging you and conceding infringement. And the JTAC standard is a substantial risk. But even if you take their articulation, which is a concrete plan, here's what the declarations say. Paragraph 9 of the long declaration, GE presently has a new design in development, and then goes on to describe it confidentially. GE fully expects UTC to accuse that engine design of infringement. DiTomaso says at 22, GE – Do you see his argument as suggesting that that declaration is unsupported by other factual evidence? Well, Your Honor – It seems to me that that's what he was saying, but that seems to be a peculiar way of looking at Article III standing, which is not a very high burden. For Article III standing to take an appeal where the statutory scheme provides you an appeal, and where if you don't have an appeal, someday you may get a stop based upon the PTAB's finding, it doesn't make sense as a matter of policy or the way the law is articulated. But even if you take Mr. Coyne's proposition, concrete plans, there are at least three paragraphs where DiTomaso or Long says, we are doing this, we're doing it now, and we have in DiTomaso, paragraph 24, describes specifically the amount of money designing this design in 2019. Second point is on the merits of the obviousness of the patent. I think we can capture all of UTC's argument when he says, when this says don't do it at all, when this says nothing of the kind, it never says anything at all about one stage versus two stage. And the one place it says anything, it says two stages are better. They are asking you to take a claim, which has now been disclaimed to the world, where the only distinction is two stages. When it says everything else, and say, no, it's patentable. It's totally inconsistent. Thank you, Your Honor. Thank you, Mr. Lee. We'll take the case on revisement.